IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED
P.M. _____ 7-19 20 11
DAVID J. MALAND, CLERK
U.S. DISTRICT COURT
By_____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| VS. | § § | CRIMINAL NO. 1:09-CR-175(12) (Judge Marcia Crone) |
| MINDY KAY MCGILVREY | § | |

**FACTUAL BASIS AND STIPULATION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorney in and for the Eastern District of Texas, joined by **Mindy Kay McGilvrey,** defendant, and her counsel of record, Guy Womack, and presents this factual basis and stipulation in support of the defendant's plea of guilty to Count One of the information filed herein, and, in support thereof, would show the following:

1. That **Mindy Kay McGilvrey**, defendant, hereby stipulates and agrees as to the facts recited in paragraph 5. Defendant stipulates and agrees to the truth of all matters set forth in these paragraphs in this factual basis and stipulation, and agrees that such admission may be used by the Court in support of her plea of guilty to Count One of an information, alleging a violation of 18 U.S.C. § 4, misprision of a felony.

2. That the defendant, who is pleading guilty to such information, is one and the same person charged in the information.

3. That the crime alleged in the information occurred on or about the dates and places specified in the information;

4. That the events described in the information occurred in the Eastern District of Texas, the Southern District of Texas and elsewhere;

5. That, had this case proceeded to trial, the government would have proven each and every essential element of the offense, beyond a reasonable doubt, through the testimony of witnesses, including expert witnesses, and through exhibits, which would have demonstrated the following:

<u>Over view of the criminal scheme</u>:

a) Beginning in the 1990s, the exact date being unknown, Edward Longoria (Longoria) and his brother-in-law, Lorenzo Espinosa (Espinosa) began to distribute cocaine HCL for mid level drug traffickers in the Houston Texas area, to include Joe Garcia. Though both Longoria and Espinosa originally served as drug and money couriers for others, they advanced in the drug trade and ultimately became large scale distributors of cocaine HCL in their own right.

b) Once Espinosa and Longoria had achieved sufficient status with Mexican sources of cocaine HCL, they began to receive regular multi-kilogram shipments of cocaine HCL from those sources of supply. That cocaine, once smuggled across the Rio Grande river in southern Texas, was then transported by various means to stash house distribution points in and around the Houston, Texas area.

c) Espinosa and Longoria distributed these multi-kilogram loads to both local customers and co-conspirators located in other states of the United States with the assistance of couriers such as Alvaro Soto and Marco Antonio Villareal. Soto, Villareal and others worked at the direction of Espinosa and Longoria and received, stored and delivered cocaine HCL in bulk to local distributors such as Warren Randle (and others) and remote customers such as Xavier Gray (and others).

d) Local distribution was achieved via the use of cellular telephones and various vehicles. When local customers were in need of cocaine HCL they typically would contact Longoria via cellular telephone. If price negotiation was necessary, Longoria would contact Espinosa via cellular telephone to confer and confirm the

then current wholesale price of cocaine HCL per kilogram being sought by the Espinosa-Longoria drug trafficking organization (DTO). Once an agreed upon price had been reached between DTO and local customer, Longoria would coordinate with couriers such as Soto and Villareal to meet with the customer for delivery of the cocaine HCL purchased.

e) Couriers, once contacted would go to a location where they could meet the local customer without drawing attention from law enforcement. Sometimes these locations were in residential areas on side streets. At other times rural locations associated with Espinosa and Longoria's cover waste management business were employed.

f) The monies generated by the local distribution of cocaine HCL by the Espinosa-Longoria DTO were regularly returned by distributors to Longoria in person, again through the coordinated use of cellular phones and various vehicles.

g) The Espinosa-Longoria DTO achieved the multi-state distribution of cocaine HCL with the help of a series of CDL commercial truck drivers. In this part of the scheme, the DTO would arrange delivery of multi-kilogram amounts of cocaine HCL via couriers (such as Soto and Villareal) to truck drivers such as Abraham Woods, Terence Young, Lawrence Wilson, Lawrence Ballard and Frank Young. Those drivers would then transport those multi-kilogram loads of cocaine HCL to locations across the eastern United States via the Eastern District of Texas.

h) The Espinosa-Longoria DTO sent multi-kilogram loads of cocaine HCL to Jackson, MS, Atlanta, GA, Columbus, OH, New Orleans, LA, Nashville, TN and Philadelphia, PA (and other destinations). The same truck drivers who transported the cocaine HCL shipments to these cities would, in turn, return the bulk cash money shipments derived from the sale of that contraband to the Espinosa-Longoria DTO in Houston, TX via the Eastern District of Texas.

i) The large amounts of tainted funds generated by the criminal scheme were transported back to Mexico and elsewhere via bulk shipments of United States funds secreted in hidden compartments and voids in automobiles and also by body carriers. These funds were transported by couriers who had knowledge of the illicit nature of the currency transported. Those couriers were employed by the scheme's principals to transport those bulk shipments of cash in order to avoid applicable reporting requirements and to conceal their ownership. Those couriers were also aware that the funds were intended to both repay drug debts and to be returned to general circulation after being used to purchase legitimate goods by individuals who had no legitimate sources of income.

j) The Espinosa-Longoria DTO utilized the services of an accountant, Mindy Kay

McGilvrey, to launder and conceal the proceeds of their criminal enterprise. To that end McGilvrey would: i) complete tax returns for Espinosa and Longoria (and other members of the scheme) that did not accurately reflect the income level/life style that McGilvrey was personally aware that Espinosa and Longoria enjoyed; ii) received, on some occasions, bulk cash lots of hundreds of thousands of United States dollars from both Espinosa and Longoria that had been derived from narcotics transactions. McGilvery then converted those tainted funds into financial instruments for the nominally legitimate purchase of real property. McGilvrey also established shell corporations for the purpose of shielding the Espinosa-Longoria DTO's unlawful activities from scrutiny behind an apparently legitimate corporate veil.

k) Law enforcement agencies became aware of the activities of sub-components of the scheme in the 1990s and from that time forward, an increasing number of seizures began to be made by those investigators of both drugs and tainted funds, to include:

|    | Date       | Location        | Co-conspirator                                                              | Seized items                          |
|----|------------|-----------------|-----------------------------------------------------------------------------|---------------------------------------|
| 1) | 10/4/2006  | Nacogdoches, TX | E. LONGORIA<br>L. ESPINOSA<br>D. COREATHERS<br>K. STARKS<br>A. SOTO<br>A. WOODS | 48 kilos<br>Cocaine HCL               |
| 2) | 12/15/2008 | Nashville, TN   | X. GRAY<br>A. SOTO<br>E. LONGORIA<br>D. ESPINOSA<br>L. WILSON<br>E. EMERSON<br>A. WOODS | 19 kilos<br>Cocaine HCL<br>$255,746.00 |

|    | Date       | Location   | Co-conspirator                        | Seized items            |
|----|------------|------------|---------------------------------------|-------------------------|
| 3) | 12/19/2008 | Vinton, LA | L. WILSON<br>F. YOUNG<br>A. SOTO      | 8 kilos<br>Cocaine HCL  |

| | | | | |
|---|---|---|---|---|
| 4) | 4/9/2009 | Beaumont, TX | A. WOODS<br>T. YOUNG | 663 lbs. MJ |
| 5) | 5/1/2009 | Jackson, MS | J. WILLIAMS<br>F. YOUNG | 25 kilos<br>Cocaine HCL |
| 6) | 6/27/2009 | Philadelphia, PA | L. ESPINOSA<br>E. LONGORIA<br>K. STARKS<br>E. EMERSON<br>T. GILMORE<br>L. WOODARD | 4 kilos<br>Cocaine HCL<br>$111,403.00 |
| 7) | 5/18/2010 | Jackson, MS | F. YOUNG<br>A. SOTO<br>J. WILLIAMS<br>F. FRANKLIN | $168,000.00 |
| 8) | 6/26/2010 | Beaumont, TX | L. ESPINOSA<br>E. LONGORIA<br>K. STARKS<br>L. BALLARD<br>M. VILLARREAL | 28 kilos<br>Cocaine HCL |

l) Properly qualified laboratory technicians would have testified that the contraband seized during the period of the defendant's criminal episode was cocaine HCL and marijuana, in the amounts indicated in paragraph 5(k) above.

As to **Mindy Kay McGilvrey's** role in the scheme:

m) **Mindy Kay McGilvrey's** (defendant's) association with the Espinosa-Longoria DTO began in the early 2000s, the exact date remaining unknown. It continued until her arrest in 2011;

n) The defendant was a family friend of the Longoria and Espinosa families and visited their homes as a social guest. Her great familiarity with and intimate access (both social and financial) to the principal members of the Espinosa-Longoria DTO gave her first hand knowledge of the nature and practices of the businesses operated by Espinosa and Longoria. During the period of her active involvement with the Espinosa-Longoria DTO, the defendant provided a variety of financial and real estate services to various members of the DTO to include: the completion and filing of Internal Revenue tax forms, based upon specious financial numbers;

the incorporation/establishment of a number of shell corporations (that once established "on paper" with state authorities, ceased to exist in fact); the completion of certain real estate transfers; the receipt of bulk cash amounts tainted United States currency (said amounts subsequently being deposited in financial institutions or converted into cashiers checks); and the use of separate corporate entities controlled by the defendant as cover purchasers of real property acquired by the DTO and later used for the receipt of narcotics shipments. These actions (collectively) shielded DTO narcotics trafficking operations from legal scrutiny and made it possible (directly and indirectly) for the DTO to convert the tainted funds derived from the sale of cocaine HCL in to seemingly untainted instruments for use in the purchase of goods and services in the legitimate economy. The defendant performed these acts at times when she either knew or should have known the clandestine and illicit nature of the DTO's drug trafficking business or after she (the defendant) had received actual notice from DTO members of the fact of their drug trafficking activities.

**Specifically:**

**As to: 18 U.S.C. §4:** The defendant knowingly conducted, or attempted to conduct, a financial transactions with proceeds from a specified unlawful activity with specific intent to conceal or disguise the source, origin, nature, ownership, or control of the proceeds.

o) On February 13, 2003 the defendant incorporated TBF Properties for Edward Longoria. The defendant listed herself as the registered agent. The purpose of this business was to manage the real estate owned by Longoria and Espinosa. The defendant further assisted Longoria in preparing real estate documents for the transfer of real estate to TBF Properties.

p) On December 31, 2003, the defendant notarized the transfer of real estate located at 2516 Fletcher Street, Houston from Francisco Longoria (father of Edward Longoria) to TBF Properties. Documents on file at the Harris County Clerk's office reflect a transfer payment of $20,000.

q) On December 31, 2003, the defendant prepared the quit claim deed and notarized the transfer of real estate located at 922 Bunton Street, Houston from Edward Longoria to TBF Properties. Documents on file at the Harris County Clerk's office reflect a transfer payment of $20,000.

r) On December 31, 2003, the defendant prepared the quit claim deed and notarized the transfer of real estate located at 2512 Everett Street, Houston from Edward Longoria to TBF Properties. Documents on file at the Harris County Clerk's office reflect a transfer payment of $20,000.

s) On December 31, 2003, the defendant prepared the quit claim deed and notarized the transfer of real estate located at 3823 Fulton Street, Houston from Edward Longoria to TBF Properties. Documents on file at the Harris County Clerk's office reflect a transfer payment of $20,000.

t) On December 14, 2009, the defendant notarized the transfer of real estate located at 12845 Green Dolphin, Houston from Tommy Ervin (Antoinette Longoria's father) to TBF Properties.

u) The defendant assisted in the April 2005 purchase of land for business location of L&E Properties, Inc., located at 16685 Firetower Rd., Conroe, TX, 77386. The defendant provided the seller with a letter saying that defendant's company, Sea Horse Marine, would be providing the $250,000 for the purchase of the property. In fact, Longoria and Espinosa were the actual purchasers of the real property and not the defendant's company. At the time of the closing on this property, Longoria and Espinosa provided hundreds of thousands of dollars (in large bills) to the defendant to use in completion of the purchase. When presented with said bulk cash funds, the defendant's due diligence consisted of asking Longoria "Do I want to know where this came from?" When Longoria relied "No", the defendant accepted the cash funds. A worksheet found during the search warrant at the defendant's business location lists the breakdown of monies deposited into defendant's "Sea Horse Marine" account at or near the time of the land purchase. Based upon FinCen Form 104s (Currency Transaction Reports) and bank records defendant made deposits of the bulk cash funds into the Sea Horse Marine bank account. Though ostensibly used for legitimate business activities, the real property purchased was also used for the large scale delivery of multi-kilogram loads of cocaine HCL received from the Gulf Cartel.

v) The defendant assisted in the purchase of a 1996 Mack roll off truck for L&E Waste Management (a DTO cover business) in August 2005. As with the real property purchase set out above, variety of payments were used to purchase the truck rather than one single transaction. Longoria and Espinosa provided the $5,000 down payment and two (2) checks from L&E Waste Management in the amounts of $17,000 and $8,000. The defendant provided a personal check for $10,000, two (2) checks from (another of her corporate entities), "Core Financial", in the amounts of $6,000 and $8,000, one check from her business, Sea Horse Marine in the amount of $2,618.87 and two (2) business checks from her husband's business, "Gemstone", in the amounts of $7,000 and $5,000. The total purchase price of the vehicle was $68,618.67.

w) Property records on file at the Harris County Clerk's Office reflect that the defendant purchased a vacant lot at 3922 Green Jade, Spring, Texas (adjacent to

property owned by Longoria and ultimately utilized by the Longoria family in undivided fashion in conjunction with the connected familial homestead) on January 31, 2007. Title company records indicate that the property was purchased using (2) cashier's checks for $500 and $30,419.29 showing the defendant as the remitter and (1) cashier's check for $40,000 showing Antoinette Longoria as the remitter. The down payment of $1,000 was provided by a personal check from the defendant.

x) In late 2009 and early 2010, a series of checks were paid to L&E Waste Management (DTO cover business) to include: $5,900 from Sea Horse Marine. No QuickBooks entries were found for the defendant and/or Sea Horse Marine on the L&E Waste Management records.

y) Beginning in the early 2000s, the defendant assisted the Espinosa-Longoria DTO by becoming the registered agent and financial contact person (and on some occasions, corporate board member) for several "shell" corporations established by the defendant on behalf of Espinosa and Longoria. Generally, these corporate entities, once established by the defendant, conducted no further record business and, more often than not, did not attend to the niceties of corporate reporting behavior as required by state authorities. As a consequence, the corporate entities established by the defendant on behalf of the DTO very often were involuntarily dis-incorporated by the action of law/state authorities at the close of their initial period of existence. That said, DTO cover businesses such as L&E Waste Management, continued to carry on ostensibly "corporate" business, the fact of their dis-incorporation notwithstanding.

z) Edward Longoria was a source of supply for cocaine for Kenneth McBryde from 1995 through 2004. In late 2002, Longoria suggested that McBryde contact Mindy Kay to help him with filing tax returns and other financial issues with an eye towards concealing his illicit income from the sale of cocaine provided to McBryde by Longoria. In early 2003, Mindy Kay met with Kenneth McBryde in Beaumont Texas, Eastern District of Texas, and prepared McBryde's 2002 federal income tax return. McBryde was dissatisfied by the first return prepared by the defendant because it showed him to be due a tax refund. As McBryde was concerned that this would potentially alert law enforcment to the illicit nature of his scheme, he instructed the defendant to re-do his tax return such that he would be required to pay additional tax to the government. No further business records of any kind were provided in support of this instruction. McBryde stated that he did not want problems with the Internal Revenue Service and requested that the tax return show a tax due and owing. The defendant, acting on those instructions change altered McBryde's 2002 Federal Tax Return to reflect a $5,000 tax due and owing. The defendant also discussed incorporation of the defendant's "cover business" (Jumpin' Gina's) as a ruse to conceal his illicit narcotics income. That

business was located in Beaumont, Texas. The defendant later filed articles of incorporation for that business with the state of Texas without McBryde's knowledge. The defendant listed McBryde's then girlfriend as a corporate officer on this documents.

aa) Beginning in 2002, Edward Longoria began operating a business called Bayou City Party Rentals, Lorenzo Espinosa opened Piñatas Alexa & Party Rentals. At Longoria's suggestion Kenneth McBryde started Jumpin' Gina's. Though all three businesses generated some legitimate income they were also used to disguise financial transactions of drug proceeds amongst themselves. All three companies were created and incorporated in the State of Texas by the defendant.

bb) Piñatas Alexa & Party Rentals was located at 5701 Bingle Street, Houston, Texas. This was the location of a Houston Police Department search warrant in August 2005 which resulted in the arrest of Lorenzo Espinosa and the seizure of cocaine and $44,260.

cc) On February 4, 2005 the defendant set up business bank accounts at the J.P. Morgan Chase Bank for Edward Longoria and Lorenzo Espinosa. The defendant was a signatory on these accounts for a period of time.

dd) On November 2, 2005, the defendant incorporated L&E Waste Management in the State of Texas and listed herself as the director. The defendant agreed to assist Longoria in setting up businesses. Longoria co-mingled drug proceeds with legitimate profits generated by the businesses incorporated by the defendant by "loaning" the business funds to cover outstanding debts. Longoria would then reimburse himself through a series of income draws from the business bank accounts.

ee) Defendant prepared tax returns for DTO associates/entities Kenneth McBryde, Alvaro Soto, Edward Longoria, Lorenzo Espinosa and L&E Waste Management at various times during their criminal episode. Defendant was aware the figures listed on the returns were not the true earned incomes of the individuals she was reporting for.

ff) Defendant's acts, including those set forth above, were active steps taken by defendant to conceal the crime of possession of 5 kilograms or more of cocaine hydrochloride with the intent to distribute.

## DEFENDANT'S SIGNATURE AND ACKNOWLEDGMENT

6. I have read this factual basis and stipulation and the information or have had them read to me and have discussed them with my attorney. I fully understand the contents of this factual basis and stipulation and agree without reservation that the United States can prove each of these acts and that it accurately describes the events about my acts and the events as recited as I know them.

Dated: 7/19/11

Mindy Kay McGilvrey
Defendant

## DEFENSE COUNSEL'S SIGNATURE AND ACKNOWLEDGMENT

7. I have read this factual basis and stipulation and the information and have reviewed them with my client, **Mindy Kay McGilvrey**. Based upon my discussions with the defendant, I am satisfied that the defendant understands the factual basis and stipulation as well as the information, and is knowingly and voluntarily agreeing to these stipulated facts.

Dated: 7/19/11

Guy Womack
Attorney for the Defendant

Respectfully submitted,

JOHN M. BALES
UNITED STATES ATTORNEY

_____
David H. Henderson
ASSISTANT UNITED STATES ATTORNEY